IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE and JANE DOE,<br>biological parents and legal guardians of<br>JANIE DOE, a minor, | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | Case No. 3:06-0202<br>Judge Trauger |
| BRYAN D. FARMER, individually, and<br>CLARKSVILLE MONTGOMERY COUNTY<br>SCHOOL SYSTEM, | ) <br> ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant

Clarksville Montgomery County School System ("CMCSS") (Docket No. 106), plaintiff Janie

Doe's response (Docket No. 115), and the defendant's reply (Docket No. 133).[1]  CMCSS has

also filed a Motion to Strike portions of the plaintiff's evidence (Docket No. 130), to which Janie

Doe has responded (Docket No. 140) and the defendant has replied (Docket No. 141).  For the

reasons discussed below, both of the defendant's motions will be granted in part and denied in

part.

---

[1] CMCSS also filed a Motion for Summary Judgment regarding all claims by plaintiffs
John Doe and Jane Doe (Docket No. 93).  John and Jane Doe did not oppose that motion (Docket
No. 113 at 1), so the court will dismiss all claims by those two plaintiffs.  Because the instant
Motion for Summary Judgment deals only with claims by Janie Doe, the term "plaintiff" in this
memorandum will refer solely to her.  "Defendant" will refer solely to CMCSS.

1

**FACTS**

This case arises out of the conduct of defendant Bryan D. Farmer, a high school physical education teacher who had sexual intercourse on several occasions with plaintiff Janie Doe ("Janie"), who at the time was a 16-year-old student.[2]

CMCSS initially hired Farmer in August 2002 to fill a temporary position at Hazelwood Elementary School. During the 2002-2003 school year, Farmer was hired as the assistant boys basketball coach at Northeast High School ("NEHS"), and he thereafter became a gym teacher at NEHS. During the relevant time period, John Hill was the principal of NEHS.

The school district's hiring procedure is to send a pool of potential candidates to interview with the principal and other teachers; the principal then recommends candidates for hire. Hill and NEHS gym teacher Debbie Caira were both present during Farmer's initial interview with CMCSS. Caira testified that Hill directed her to ask Farmer to explain a rumor about his conduct with female students at his prior school. Caira thought that asking this question was strange. After Farmer responded, neither Caira nor Hill asked any follow-up questions on the topic.

Although Farmer did not mention it, he had in fact been forced to resign from his

_____

[2] Unless otherwise noted, the facts are drawn from the defendant's Statement of Undisputed Material Facts (Docket No. 108) and the plaintiff's response thereto (Docket No. 121), the plaintiff's Statement of Additional Undisputed Facts (Docket No. 122) and the defendant's response thereto (Docket No. 131), and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

previous job in Franklin County, Tennessee because of an inappropriate relationship with a female student. Farmer was never prosecuted for this conduct. Hill testified that he was not aware of rumors about Farmer's conduct and that he usually asks questions about behavior with female students when interviewing young, unmarried male applicants. CMCSS' criminal background check on Farmer showed no criminal history. Farmer received favorable recommendations from two Franklin County School System officials, neither of whom advised CMCSS that the Department of Children's Services had investigated Farmer.

Janie was a student at NEHS from 2002 until her graduation in 2006. She was a cheerleader, and although she was not in Farmer's class, she met Farmer when she was a sophomore. During Janie's junior year, Farmer began flirting with her, hugging her in the hallways and talking with her regularly. One evening in December 2004, Farmer sent several instant messages to Janie's home computer, making sexually suggestive comments and daring her to go to his apartment. The next night, Farmer sent text messages to Janie's cell phone, again urging her to visit him. Janie drove to Farmer's apartment, where they had sex. Farmer also had sex with Janie on two subsequent occasions, once in January 2005 and once in the summer of 2005. Each time, Janie willingly drove to Farmer's apartment. Janie kept her relationship with Farmer secret from her parents, friends, and teachers.

When Janie returned for her senior year in the fall of 2005, she heard rumors that Farmer had slept with several female students. This was at least partly true, because during the 2004-2005 school year, Farmer had engaged in a sexual relationship with another female student, Janie Doe II ("Janie II"), which overlapped with Farmer's relationship with Janie. Janie II was a 17-

year-old senior at the time.

Janie II was also a cheerleader. During Janie II's junior year, Farmer began to flirt with her. He would hug her in the hallways "in the presence of students, teachers, and administrators." (Docket No. 131 ¶ 29.) Janie II frequently spent time in Farmer's office in the boy's locker room, visiting him and grading his papers. Farmer made sexual advances toward her in his office, including kissing her and touching her chest. Farmer also frequently "broadcasted" Janie II out of class during her junior year.[3]

On trips to away basketball games, Farmer would ask Janie II to sit near him on the school bus. At one game near the end of the 2003-2004 basketball season, Elaine Hoffert, a teacher and cheerleader coach, noticed that Janie II and Farmer appeared to be text messaging each other. She reported this to Assistant Principal Ann Moseley, who called Janie II into her office but did not pursue the matter further. Moseley mentioned the episode to Hill. On a separate occasion, Hoffert told Moseley that she saw Janie II and Farmer having a conversation alone in the gym during school hours. Moseley again told Hill. Hill testified that he questioned Farmer about it, who said that it was "just one of those things, she came up to him and started talking." (Docket No. 134, Ex. 6 at 52.)

At one basketball tournament, Farmer shared a hotel room with fellow gym teacher and basketball head coach Al Cooper. Janie II visited the room; while she was there, Farmer came out of the shower without a shirt, and he winked at her in the mirror as he shaved. Farmer also

_____

[3] Although the parties do not define the term "broadcast," it presumably means that Janie II was told via announcement to leave class and see Farmer.

4

sat on the bed next to Janie II and rubbed her leg.

At one point during Janie II's junior year, she was informed that she was no longer allowed to go to the gym during her "advisory" class period.[4] When Janie II questioned her advisory teacher about it, the teacher responded, "You will have to ask Mr. Hill." Similarly, Debbie Caira testified that the directive barring Janie II from the gym came from Hill. Hill testified that he did this because Janie II was abusing the sign-out process. Hill had a meeting with Cooper and Farmer to discuss the situation; Gabriel Segovia, NEHS' student resource officer,[5] swore in an affidavit that he saw Farmer angrily leave the meeting. Segovia said that Hill then told Segovia to escort Janie II to and from her advisory class period.

When Janie II started her senior year, gym teacher Debbie Caira told her that she was not allowed to be a student aide for Farmer. More than once during the 2004-2005 school year, however, Janie II engaged in sexual activity with Farmer in his office. She also met Farmer after three basketball games to engage in various sexual activities.

Al Cooper testified that, at one point, he found a note on Farmer's desk that had romantic overtones. He found another note in which two girls mentioned Farmer's name and made sexual implications about Farmer. Cooper spoke with Hill and Assistant Principal Chris Winters about the latter note. Cooper also received an anonymous email, suggesting that there was inappropriate behavior between gym teachers and students and threatening to go to the media. The email had a sexual subtext, and Cooper believed that the message was directed to Farmer.

---

[4] The advisory class was similar to a study hall.

[5] As a student resource officer, Segovia was employed by the sheriff's department.

Cooper took this email to Hill, who disregarded it.

At one point, Hill told Cooper that he had talked to Farmer "about how the young girls are and to make sure he does the right thing." (Docket No. 124, Ex. 12 at 130). Cooper thought that Hill had concerns about Farmer's conduct. A number of teachers testified that there were rumors in the school regarding Farmer and female students, although they also testified that they did not suspect that Farmer was actually having sex with students.

After the 2004-2005 school year, Farmer resigned from CMCSS to take a basketball coaching position in Cheatham County, Tennessee. In the fall of 2005, the Clarksville Police Department launched an investigation into Farmer's alleged sexual misconduct. At that point, Janie came forward with details about her relationship with Farmer. Farmer was eventually convicted of sexual battery by an authority figure.

CMCSS has policies prohibiting sexual harassment, and it provides regular sexual harassment prevention training to its teachers. The school district's policy is to investigate all complaints of sexual harassment, formal or informal. NEHS' protocol provides that teachers can report instances of sexual harassment or abuse to the principal. CMCSS policy provides that the principal should then notify the school district's human rights officer, who will appoint an official to investigate the conduct. Neither Janie nor Janie II notified Hill or any other administrator of Farmer's sexual abuse. CMCSS Director of Schools Sandra Husk and Chief Human Resources Director Bruce Jobe provided uncontroverted testimony that any information they had regarding Farmer's misconduct was obtained after the criminal investigation.

## ANALYSIS

6

Janie has asserted claims against CMCSS under Title IX, 42 U.S.C. § 1983, and Tennessee tort law. The defendant has filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## I.       Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must prove the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir.

7

1999).  To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).  If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249-52.

## II.     CMCSS' Motion to Strike

Before addressing the merits of CMCSS' Motion for Summary Judgment, the court must first address its Motion to Strike.

### A.     Witnesses' Statements to the Police

In support of her summary judgment briefing, the plaintiff has submitted several unsworn statements that were collected by Detective Tony Blakely during the Clarksville Police Department's investigation of Farmer.  These statements were written by the witnesses themselves; some of the statements contain witnesses' responses to the detective's written questions, while others simply contain paragraphs of narrative.  The defendant argues that the statements are inadmissible hearsay.[6]

---

[6] CMCSS challenges the admissibility of the statements given by Elaine Hoffert (Docket No. 125), Debbie Caira (Docket No. 125, Exs. 1-2), Al Cooper (Docket No. 125, Exs. 3-4), Chris Winters (Docket No. 125, Ex. 5), Ann Moseley (Docket No. 125, Ex. 7), Nikki Davis (Docket

In opposing summary judgment, a party cannot rely on hearsay. The party "must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 559 (6th Cir. 2009). "That is why '[h]earsay evidence . . . must be disregarded.'" *Id.* (affirming the district court's decision to disregard an e-mail, handwritten notes, an unidentified typed paragraph, and the plaintiff's resume) (internal citation omitted).

The plaintiff argues that, because the statements were collected in the course of a police investigation, they fall under the "records of regularly conducted activity" hearsay exception in Federal Rule of Evidence 803(6).[7] The plaintiff fails to address, however, that there are two levels of hearsay in the reports: first, the reports themselves, and second, the statements by the witnesses. Although the hearsay exceptions in Rules 803(6) and 803(8) can apply to information in police reports, they do not solve hearsay problems with witnesses' statements listed therein. "'[A statement of a third party] is plainly not admissible merely because contained in a police report. It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted *but that statements made by third persons under no business duty to report may not.*'" *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994) (quoting *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983)) (internal citation omitted); *see also Chi. Ins. Co. v. Chimnee Cricket, Inc.*, 17 Fed. Appx. 374, 378 (6th Cir. 2001)

No. 125, Ex. 8), Erica Scott (Docket No. 125, Ex. 9), Mary Elizabeth Hart (Docket No. 125, Ex. 10), and Gabriel Segovia (Docket No. 125, Exs. 11-13).

[7] The court notes that Rule 803(8)(C), which grants an exception to factual findings from a criminal investigation, might also apply here.

(excluding report when it "consist[ed] of a series of statements that [the report's author] admit[ted] were told to him by other people, not findings that he independently developed through his own research.").  The police reports here consist exclusively of statements by third party witnesses.  Because those statements are offered for the truth of their assertions, they are inadmissible hearsay.[8]  *See* Fed. R. Evid. 801(c), 802.

In an attempt to save these unsworn statements, the plaintiff argues that Hoffert, Caira, Cooper, Winters, and Moseley gave testimony in their depositions that "authenticated" their statements, and the plaintiff seeks leave to attach this testimony.  (Docket No. 140 at 2.)  It is puzzling why the plaintiff would not cite exclusively to sworn deposition testimony in the first place.  Regardless, for every material fact contained in these five witnesses' statements and referenced by the plaintiff, the plaintiff's Statement of Additional Undisputed Facts contains a citation to the deposition record.  Accordingly, the court will not strike paragraphs 36, 57-67, 74, 89, 116, or 122 from the Statement of Additional Undisputed Facts.  Additionally, the material facts contained in paragraphs 165-171 are supported by Gabriel Segovia's affidavit (Docket No. 120), so the court will not strike these paragraphs.

The court will, however, strike the statements of Nikki Davis, Erica Scott, Mary Elizabeth Hart, and all references to them – specifically, paragraphs 130-142 of the Statement of Additional Undisputed Facts.  Davis, an NEHS student, told the police that Janie Doe II was uncomfortable when Farmer "broadcasted" her out of class.  (Docket No. 125, Ex. 8.)  Scott, a

---

[8] CMCSS also argued that the documents were improper because they were unauthenticated, but in her response to the Motion to Strike, the plaintiff attached an affidavit from the police department's custodian of records authenticating them.  (Docket No. 140, Ex. 1.)

parent of a student, told police that, during the 2003-2004 basketball season, she saw Farmer straddling a female student against the school building and that she reported this to Hill. (*Id.* Ex. 9.) Hart, a substitute teacher, told police that a student told her that another student was sleeping with Farmer. (*Id.* Ex. 10.) Hart said that she reported this to Hill, who responded that "kids are kids and sometimes they say things." (*Id.*) All of these statements are inadmissible hearsay that the court cannot consider on summary judgment.

### B.    Affidavits

The defendant also moves to strike the affidavits of Janie and Janie II, arguing that the affidavits are inconsistent with the girls' prior sworn deposition testimony.

Generally, a party cannot create a genuine dispute of material fact by attaching an affidavit that contradicts prior deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). But an affidavit is permissible "so long as the affidavit is not intended to create a sham issue of fact – that is, if the nonmoving party was confused during the deposition or has some other legitimate justification." *Id.* at 908. Thus, a court should strike a "directly contradictory" affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.*

CMCSS claims that Janie II's affidavit contradicts her earlier testimony regarding: (1) when Farmer started flirting with her; (2) who told her that she could not be a student aide for Farmer; (3) when the prohibition on her visiting the gym was lifted; (4) what events occurred at

11

the hotel during the basketball tournament; and (5) whether she asked Wilson why she was no longer allowed to go to the gym. (Docket No. 130 at 6-11.) As to the first three points, the defendant has not shown that Janie II's affidavit directly contradicts her prior testimony.

As to point (4), Janie II's affidavit states that, during the basketball tournament, Farmer allowed her to come into his hotel room, at which time he sat next to her on the bed and rubbed her leg. (Docket No. 118 ¶ 32.) In her deposition, Janie II omitted this detail when asked at length about Farmer's behavior that night. As to point (5), Janie II's affidavit states that she asked her advisory teacher why she was no longer allowed to go to the gym, and the teacher responded, "You will have to ask Mr. Hill." (Docket No. 118 ¶¶ 25-26.) In her deposition, Janie II testified that she never asked the teacher why she could not go to the gym. On these two points, the affidavit directly contradicts Janie II's deposition testimony.

The plaintiff urges the court to take Janie II's age into consideration. (Docket No. 140 at 3.) These events occurred when Janie II was 15 or 16 years old, four years before her deposition. The court finds that Janie II might legitimately have difficulty recalling every detail regarding the years-long time line at issue in this case. Because the contradictions involve two relatively minor details, the court cannot say that the affidavit is a sham, so it will not strike any portion of Janie II's affidavit. *Cf. Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997) (in a case that hinged on whether the plaintiff could walk, the court struck an affidavit that flatly contradicted the plaintiff's earlier testimony that he could walk).

CMCSS similarly argues that portions of Janie's affidavit should be stricken. The asserted contradictions are: (1) how many times Farmer sent instant messages before having sex

with Janie; (2) whether Farmer flirted with her and hugged her in the hallways during her junior year; and (3) the rumors Janie heard about Farmer and other students. (Docket No. 130 at 11-17.) On the first two points, there is no direct contradiction between the affidavit and Janie's deposition testimony.

On point (3), Janie's affidavit states that she heard rumors that Farmer had relationships with seven different girls. (Docket No. 117 ¶ 26.) At her deposition, Janie testified that she specifically remembered rumors about two girls. As above, this is a relatively minor discrepancy that can be explained by Janie's youth and the amount of time between the events and the testimony. Again, nothing supports the conclusion that the affidavit is a sham, so the court will not strike it.

Finally, the defendant moves to strike as hearsay paragraph 27 of Janie's affidavit, which states: "Farmer told me that Ms. Parker, a NEHS theater teacher[,] heard some girls talking about our relationship, and told Coach Caira who told Cooper who then told Farmer." (Docket No. 117 ¶ 27.) The plaintiff argues that Farmer's statement is an admission by a party opponent and is thus not hearsay under Rule 801(d)(2). But the plaintiff is introducing this statement against CMCSS, not against Farmer. Rule 801(d)(2)(A) applies only to "the party's own statement." The exception does not apply when a plaintiff seeks to admit the statement of a co-defendant. *United States v. Hay*, 122 F.3d 1233, 1236-37 (9th Cir. 1997); *cf. United States v. Vasilakos*, 508 F.3d 401, 407 (6th Cir. 2007) (allowing statements that were "offered and received only against the party who made [them]"). Because the statement is being offered against CMCSS, the court will strike it for the purpose of this summary judgment ruling.

13

## III. Title IX Claim

The plaintiff claims that CMCSS violated Title IX by failing to respond reasonably to Farmer's sexual abuse of students. In response, the defendant argues that nobody with sufficient authority had actual knowledge of the abuse.[9]

Title IX of the Education Amendments of 1972 provides that no person "shall, on the basis of sex, be . . . denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under Title IX, a school has a duty to prevent sexual harassment or abuse of a student by a teacher. *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274 (1998). Because Title IX is aimed at preventing intentional discrimination, a school district is not vicariously liable simply because a teacher abuses a student. Instead, a person of authority must have actual knowledge of abuse or harassment, and that person must act with deliberate indifference to that information. *Id.* at 290-91. Thus, the plaintiff must show that (1) Farmer abused her, (2) a school official with sufficient authority had actual notice that Farmer posed a substantial risk of abuse to students, and (3) the school district was deliberately indifferent to that substantial risk.[10] *Williams v. Paint Valley*

---

[9] CMCSS argues in its reply that the court should disregard Janie Doe's response brief as untimely. (Docket No. 133 at 1-2.) But the plaintiff's counsel filed a Motion for Extension of Time for the response regarding John and Jane Doe's claims, which the court granted. (Docket Nos. 111-12.) The same counsel represents Janie Doe. The court will not punish the clerical omission of Janie Doe's name on the Motion for Extension of Time by disregarding her response brief.

[10] The defendant incorrectly asserts that the plaintiff must prove a fourth element: that the abuse was so pervasive and objectively offensive that it deprived her of access to the educational opportunities or benefits provided by the school. (Docket No. 107 at 15-16.) This element is taken from *Davis v. Monroe County Board of Education*, 526 U.S. 629, 650 (1999), which addressed peer-on-peer abuse, not teacher-on-student abuse.

14

*Local Sch. Dist.*, 400 F.3d 360, 363 (6th Cir. 2005). To constitute deliberate indifference, the school's response must be "'clearly unreasonable in light of the known circumstances.'" *Id.* at 367 (quoting *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000)) (internal citation omitted).

### A.     Hill's Authority

A school district can be held liable under Title IX only if an appropriate person had knowledge of the abuse. The Supreme Court in *Gebser* stated that an "appropriate person" is, "at a minimum, an official of the [school district] with authority to take corrective action to end the discrimination." 524 U.S. at 290. This person must be able to "address the alleged discrimination and to institute corrective measures." *Id.*

The defendant argues that Hill, the principal of NEHS, is not an appropriate person under this standard. It argues that it can be liable only if Sandra Husk, the Director of Schools, knew of Farmer's abuse, because only she had the authority to fire or suspend Farmer. *See* Tenn. Code Ann. § 49-2-301(b)(1)(GG). Tennessee law provides, however, that it is a principal's duty to "[s]upervise the operation and management of the personnel . . . of the school" and to "[s]ubmit recommendations to the director of schools regarding the appointment and dismissal of all personnel . . .and make decisions regarding the specific duties of all personnel." *Id.* § 49-2-303(b)(1), (3).

The Eighth Circuit recently stated that "[i]t is apparent from Supreme Court precedent . . . that school principals are considered 'appropriate persons' in the Title IX analysis." *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009); *see also Murrell v. School Dist.*

15

*No. 1*, 186 F.3d 1238, 1248 (10th Cir. 1999) ("We find little room for doubt that the highest-ranking administrator at [the high school] exercised substantial control of . . . [the] school environment during school hours.")  In assessing Virginia's similar statutory scheme, however, the Fourth Circuit held that a principal was not an "appropriate person," because he or she lacks "the power to hire, fire, transfer, or suspend teachers."  *Baynard v. Malone*, 268 F.3d 228, 239 (4th Cir. 2001).  But the dissent in *Baynard* had the better argument: as the highest-ranking official at the school, a principal has "the duty and authority to implement various measures that [would] contribute[] to preventing or stopping" a teacher's abuse.  *Id.* at 243 (Michael, J., dissenting in part).  For instance, a principal can confront a teacher and, as the teacher's supervisor, order a stop to any inappropriate behavior.  *Id.* at 243.  "As long as the official possesses the ability and the duty to take meaningful steps toward stopping the abuse, the official's deliberate indifference should translate into school board liability under Title IX."  *Id.* at 243-44.

Obviously, principals in Tennessee retain some amount of control over their schools and the teachers working under them; otherwise, they would have no ability to supervise and manage personnel, as required by statute.  Assistant Principal Winters testified that Hill had the authority to discipline NEHS' coaches.  (Docket No. 132, Ex. 10 at 12.)  Furthermore, it was Hill's responsibility under the school district's policy to receive allegations of sexual abuse.  *See Massey v. Akron City Bd. of Educ.*, 82 F. Supp. 2d 735, 744 n.7 (N.D. Ohio 2000) ("A school also receives notice when notice is given to any employee whom the school has designated to respond to harassment complaints.")  In light of these facts, the court finds that Hill is an

appropriate person for Title IX purposes.

On the other hand, it is clear that Farmer's fellow teachers are not appropriate persons, since they lacked any supervisory power over Farmer. Even if Cooper, Caira, or other teachers knew that Farmer was abusing students, their knowledge cannot create liability for the school district.

### B.      Hill's Knowledge

Thus, the central issue is Hill's knowledge of Farmer's conduct and the risk that Farmer presented to NEHS' female students. A school district will only be liable under Title IX if it has "actual notice of . . . the teacher's misconduct." *Gebser*, 524 U.S. at 277. The plaintiff must show that the school district knew of a substantial risk that the teacher would sexually abuse a student. *See Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 363, 368 (6th Cir. 2005) (approving of the "'substantial risk' gloss" in a lower court's formulation of the Title IX elements).

Much of the plaintiff's evidence relates to Farmer's sexual abuse of Janie II. The defendant argues that this evidence is irrelevant to Janie's claims. (Docket No. 133 at 2-3.) But the "actual notice" required by *Gebser* is not notice that a particular plaintiff was being abused. Instead, a plaintiff only needs to establish "that the school district failed to act even though it knew that [the teacher] posed a substantial risk of harassing students in general." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997); *see also Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 688 (W.D. Ky. 2003) ("[T]he Gebser notice standard does not require that the offending instructor actually commit previous acts of harassment against the

17

plaintiff-student . . . before the institution may be held liable for the instructor's subsequent repeated misconduct under Title IX."); *Hart v. Paint Valley Local Sch. Dist.*, No. C2-01-004, 2002 U.S. Dist. LEXIS 25720, at *22 (S.D. Ohio Nov. 15, 2002) (holding that the actual notice standard is met by "actual knowledge of a substantial risk of abuse to children in the school based on prior complaint of other students"); *Lopez v. Metro. Gov't*, No. 3:07-0799, 2009 U.S. Dist. LEXIS 57578, at *58-60 (M.D. Tenn. July 7, 2009) (in a student-on-student harassment case, holding that notice of harassment of students other than the plaintiff can suffice). *But see Baynard*, 268 F.3d at 237-38 (requiring knowledge of "the discriminatory conduct in question"); *DT v. Somers Cent. Sch. Dist.*, No. 08-6207-cv, 2009 U.S. App. LEXIS 22613, at *4-5 (2d Cir. Oct. 15, 2009) (questioning whether notice of harassment of other students can constitute notice of peer-on-peer harassment of the plaintiff).

The court finds that the plaintiff can meet her burden by showing that the defendant knew that Farmer was abusing Janie II, because such abuse implies a substantial risk that Farmer was abusing other students as well. This is consistent with the primary objectives of Title IX, which are (1) "to avoid the use of federal resources to support discriminatory practices" and (2) to provide individuals "effective protection against those practices." *Gebser*, 524 U.S. at 286 (citation omitted). The Supreme Court in *Gebser* was concerned with "ensuring 'that the [school has] notice that it will be liable for a monetary award'"; without actual knowledge, a school district would have no "opportunity to take action to end the harassment or to limit further harassment." *Id.* at 287, 289. But if a school district has knowledge that *any* student is being abused by a particular teacher, the school has the opportunity to take action regarding that

18

teacher's harassment.  It should come as no surprise to the school that it will be liable if the

teacher is also contemporaneously abusing a different student.

The plaintiff submits the following evidence to show that Hill knew that Farmer

presented a substantial risk to NEHS' female students:

- Once the criminal investigation of Farmer started, Student Resource Officer Segovia heard Cooper and Hill discussing the investigation.  He heard Hill ask, "Is it the girl we suspected?"[11]  Segovia concluded that Cooper and Hill had suspected that Farmer was having a relationship with a student.  (Docket No. 120 ¶¶ 8-10.)

- Hill told Cooper that he had talked to Farmer about young girls and had told Farmer to "do the right thing."  (Docket No. 131 ¶ 92.)  Cooper testified that Hill "probably had some concerns" about Farmer's behavior with young girls.  (Docket No. 134, Ex. 3 at 130.)

- During Farmer's interview for a position at NEHS, Hill directed Caira to ask Farmer about a rumor regarding his conduct with female students at Farmer's previous school.  Caira thought that this question was strange.  (Docket No. 131 ¶¶ 61-63.)

- Hill barred Janie II from going to the gym during her advisory class.  (Docket No. 118 ¶¶ 24-26.)  Hill then asked Segovia to escort Janie II to and from her advisory class.  This happened after Segovia observed a visibly angry Farmer leaving a meeting with Hill and Cooper.  (Docket No. 120 ¶¶ 6-7.)

- Cooper received an anonymous email threatening that if "P.E. teachers are messing with any students," the sender would go to the media.  Cooper believed that this referred to Farmer's behavior, and he took the email to Hill.  Hill's response was that the email was anonymous and that "he doesn't deal in anonymous."  Hill told Cooper to "trash it or respond to it."  (Docket No. 131 ¶¶ 84-86; Docket No. 134, Ex. 3 at 53-54.)

---

[11] In its Motion to Strike, CMCSS argues that this statement by Hill is hearsay.  (Docket No. 130 at 5.)  But if a statement offered against a party is "'a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,' it is properly attributed to the employer under [Rule] 801(d)(2)(D) and consequently is not hearsay."  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 527 (6th Cir. 2007) (citation omitted).  Hill's duties included supervising teachers and responding to allegations of sexual abuse, so the comment was within the scope of his employment.  It is thus admissible as an admission by CMCSS.

- Hill saw a note between two students mentioning that Farmer and Cooper were cute, and he asked Winters to talk to them about the note. (Docket No. 132, Ex. 10 at 13.)

- Farmer "regularly began hugging [Janie II] in the hallways of the school in the presence of . . . administrators." (Docket No. 131 ¶ 29.)

- Hill received a report, via Vice Principal Moseley, that Farmer and Janie II were texting each other during a basketball game. (*Id.* ¶¶ 104-05, 125.) Hill later received another report that Janie II and Farmer were alone in the gym, and he questioned Farmer about it. (Hill Dep., Docket No. 134, Ex. 6 at 52.)

From this evidence, a jury could reasonably conclude that Hill had actual knowledge (1) that there was a substantial risk that Farmer was sexually abusing Janie II and (2) that there was an attendant risk that Farmer was abusing other female students as well. A jury could also find that Hill's response to the situation – advising Farmer a single time to be careful around young girls and temporarily barring Janie II from the gym – was a clearly unreasonable response to the circumstances. CMCSS, of course, disputes that Hill had any knowledge and offers contrary evidence of its own. In fact, it spends three pages of its reply brief explaining away the plaintiff's evidence. (Docket No. 133 at 5-8.) But once the plaintiff has made the requisite evidentiary showing, the court's role at the summary judgment stage is not to weigh the evidence.

The defendant points out that Janie II's relationship with Farmer occurred at the same time as Janie's relationship. (*Id.* at 8.) But some of the evidence regarding Janie II predates the 2004-2005 school year. Also, the plaintiff's relationship continued through the summer of 2005, after Farmer's relationship with Janie II had ended. Thus, a jury could find that the plaintiff was sexually abused by Farmer at least once after Hill had actual notice of a substantial risk. Accordingly, the court will not dismiss the plaintiff's Title IX claim.

20

## IV.    Section 1983 Claim

The plaintiff also asserts a § 1983 claim against CMCSS.  A plaintiff may bring a § 1983

claim if he or she is deprived of any constitutional right as a result "of any statute, ordinance,

regulation, custom, or usage, of any State."  42 U.S.C. § 1983.  A student has a constitutional

right "to be free from sexual abuse at the hands of a public school employee."  *Doe v. Claiborne*

*County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996).

To support liability under § 1983, a plaintiff must establish:

> (1) the existence of a clear and persistent pattern of sexual abuse
> by school employees;
>
> (2) notice or constructive notice on the part of the School Board;
>
> (3) the School Board's tacit approval of the unconstitutional
> conduct, such that their deliberate indifference in their failure to
> act can be said to amount to an official policy of inaction; and
>
> (4) that the School Board's custom was the "moving force" or
> direct causal link in the constitutional deprivation.

*Id.* at 508; *see also Paint Valley*, 400 F.3d at 369.  The plaintiff "must show that the School

Board *itself* is the wrongdoer."  *Claiborne County*, 103 F.3d at 507.

Put another way, a school district is liable for a teacher's abuse if "the toleration of a

custom" led to the wrongdoing.  *Id.* (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658

(1978)).  The Sixth Circuit has explained the meaning of "custom" in this context:

> A "custom" for the purposes of *Monell* liability must "be so
> permanent and well settled as to constitute a custom or usage with
> the force of law."  In turn, the notion of "law" must include
> "deeply embedded traditional ways of carrying out state policy."
> It must reflect a course of action deliberately chosen from among
> various alternatives.  In short, a "custom" is a "legal institution"

21

not memorialized by written law.

*Id.* at 507-08 (citations omitted). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *see also Mann v. Helmig*, 289 Fed. Appx. 845, 851 (6th Cir. 2008). In that case, the policymaker must "possess[] final authority to establish municipal policy with respect to the action ordered." *Monistere v. City of Memphis*, 115 Fed. Appx. 845, 851 (6th Cir. 2004) (citation omitted).

The plaintiff argues that CMCSS "had a custom of failing to prevent sexual abuse by teachers after repeated notice of trouble with the teacher that should have suggested the teacher was a sexual predator." (Docket No. 116 at 31.) But she has introduced no evidence that the school board had such a custom. In fact, it is undisputed that the CMCSS board and Director Husk were unaware of Farmer's misconduct until the police investigation began. Instead, the plaintiff's evidence relates to Principal Hill's notice of Farmer's relationship with Janie II. Although Hill is an appropriate official for Title IX notice purposes, it does not follow that he has final policymaking authority for purposes of § 1983 liability, or that his inaction can subject the school district to liability under § 1983. *Doe v. Fults*, No. 3:04-0143, 2006 U.S. Dist. LEXIS 3012, at *14 n.1 (M.D. Tenn. Jan. 20, 2006); *Plamp*, 565 F.3d at 460 (finding that principals were appropriate persons for Title IX notice purposes, but holding that "the in-house school administration," as opposed to the school board, "cannot be considered a 'policymaking body' for the purposes of the notice requirement under § 1983").

22

Whether an official has final policymaking authority is a question of state law for the court to decide. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). The Sixth Circuit has found that an official is a policymaker if the official's actions are "(1) final, (2) not reviewable, and (3) unconstrained by the existing policies and practices of his supervisor[s]," or where the official has been delegated "unfettered discretion." *Monistere*, 115 Fed. Appx. at 852-53. In Tennessee, a principal is required to act "under the supervision of the director of schools and in accordance with the written policies of the local board of education." Tenn. Code Ann. § 49-2-303(b)(2). Clearly, Hill did not have unfettered discretion in dealing with instances of sexual abuse. Instead, he was required to report such allegations to his superiors, and he was required to follow the school district's sexual harassment policies. Hill's alleged inaction cannot create liability for CMCSS.

Indeed, courts often find that principals lack the authority to expose school districts to § 1983 liability. *E.g.*, *Wilson v. Webb*, No. 99-5459, 2000 U.S. App. LEXIS 23585, at *19 (6th Cir. Sept. 13, 2000) (finding that only the county superintendent, not the high school principal, "had the final policymaking authority sufficient to subject the school district to liability," and citing similar Kentucky statutes); *Phillips v. Anderson County Bd. of Educ.*, No. 3:06-CV-35, 2006 U.S. Dist. LEXIS 92120, at *17-19 (E.D. Tenn. Dec. 19, 2006) (finding that a Tennessee principal did not have final policymaking authority in a sex discrimination case); *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 217 (5th Cir. 1998) (noting that, under Texas law, "principals were [only] given the discretion to handle allegations of sexual abuse, not . . . the broader authority to formulate official policy on the subject"); *Plamp*, 565 F.3d at 460. In

23

contrast, cases finding liability under § 1983 typically involve notice to the school board itself or to the school district's superintendent. *E.g.*, *Doe v. Warren Consol. Schs.*, 307 F. Supp. 2d 860, 887 (E.D. Mich. 2003) (premising § 1983 liability on the actions of the superintendent's office); *Hart*, 2002 U.S. Dist. LEXIS 25720, at *8, 10 (S.D. Ohio Nov. 15, 2002) (describing the school board's discussions regarding a teacher's previous abuse of students); *Massey*, 82 F. Supp. 2d at 738-41 (describing the school board's knowledge of allegations of misconduct).

Furthermore, the plaintiff has shown at most that Hill and other NEHS employees had notice of Farmer's sexual abuse of Janie II – that they consciously ignored one teacher's relationship with a single student. This is disturbing if true, but given that Hill is not a policymaker within the school district, it does not constitute a "custom" of ignoring sexual abuse. As the Sixth Circuit has noted, "[t]here is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions." *Claiborne County*, 103 F.3d at 495. Similarly, the plaintiff has failed to show the existence of a "clear and persistent pattern of sexual abuse by school employees." The plaintiff does not present evidence that Hill or CMCSS generally ignored sexual abuse, that they ignored abuse by other teachers, or that they ignored a long pattern of abuse by Farmer. *See Swanson v. Livingston County*, 121 Fed. Appx. 80, 85 (6th Cir. 2005) ("Nor has Swanson identified a single incident of alleged harassment against any individual but herself. In fact, Livingston County has a policy against sexual harassment and Swanson has submitted no evidence to show that the County does not enforce this policy.") (citations omitted); *cf. Craig v. Lima City Schs. Bd. of Ed.*, 384 F. Supp. 2d 1136, 1148 (N.D.

24

Ohio 2005) (noting that the school board responded to previous incidents of abuse by (1) allowing employees to resign and giving them favorable recommendations, (2) agreeing not to report the incidents to the legal authorities, and (3) failing to institute proper corrective policies); *Warren Consol. Schs.*, 307 F. Supp. 2d at 887 (allowing § 1983 claim to go forward on summary judgment where the teacher's misconduct "continued on a consistent basis" from 1984 to 1998); *Hart*, 2002 U.S. Dist. LEXIS 25720, at *7-12, 34-35 (same, where the teacher had previously faced allegations of sexual abuse in 1976 and 1990); *Massey*, 82 F. Supp. 2d at 738 (same, where the plaintiff showed "a long history of [the teacher's] conduct suggestive of pedophilia towards boys and young men")

The Sixth Circuit's decision in *Claiborne County* is instructive. In that case, the plaintiff was sexually harassed and statutorily raped by a middle school gym teacher. At his previous job, the teacher was investigated by the Department of Human Services for the sexual abuse of nine girls; DHS determined that four of the nine allegations were "founded." 103 F.3d at 502. The teacher ultimately reached a settlement providing that DHS would not pursue criminal charges, "but that it would notify the appropriate school boards so that any further course of action would be up to them." *Id.* After the teacher was hired by the defendant, a school board member heard rumors that he was behaving inappropriately with female students, and one student complained to a guidance counselor that the teacher had sexually harassed her. *Id.* at 503. The superintendent and various school board members knew of these facts. Nevertheless, the school district was not liable under § 1983 for the teacher's abuse of the plaintiff. *Id.* at 509. In a later case, the Sixth Circuit summarized its holding:

25

> [E]ven where a school board had some information that one of its teachers may have sexually abused students in the past and the board failed to remove him before he abused the plaintiff, the school board could not be found liable for having a policy, custom, or practice of condoning such abuse because *there was no evidence that the school board failed to act regarding other teachers in similar circumstances*; thus there was no evidence of any deliberate pattern. [*Claiborne County*] makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (citations omitted) (emphasis added). Here, the plaintiff has presented no evidence that CMCSS failed to act regarding any teacher other than Farmer.

In sum, Principal Hill was not a final policymaker whose actions could subject CMCSS to liability, and the plaintiff has not shown that the school district had a custom of ignoring sexual abuse. Accordingly, the court will dismiss the plaintiff's § 1983 claim.

## V.    Immunity from Certain Common Law Claims

The defendant argues that it is entitled to immunity from the plaintiff's state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and outrageous conduct. The Tennessee Governmental Tort Liability Act ("GTLA") provides immunity for governmental entities from claims of "infliction of mental anguish." Tenn. Code Ann. § 29-20-205(2). This applies to claims for intentional and negligent infliction of emotional distress. *Moss v. Shelby County*, 401 F. Supp. 2d 850, 857 (W.D. Tenn. 2005). It also applies to the plaintiff's claim for outrageous conduct, because "[i]n Tennessee, the tort of intentional infliction of emotional distress is synonymous with the tort of outrageous conduct." *Runions v.*

26

*Tenn. State Univ.*, No. M2008-01574-COA-R3-CV, 2009 Tenn. App. LEXIS 420 (Tenn. Ct.

App. July 6, 2009) (citing *Lyons v. Farmers Ins. Exch.*, 26 S.W.3d 888, 893 (Tenn. Ct. App.

2000)).  The plaintiff cites no authority to the contrary,[12] so the court will dismiss these claims.

## VI.    Negligence Claims

The defendant spends several pages of its brief arguing that the plaintiff's negligence

claim should be dismissed because of her comparative negligence.  (Docket No. 107 at 24-27.)

The plaintiff responds with four sentences, two of which are: "First, the comparative fault is

wholly inapplicable to the case at bar since *the Plaintiff's claims are not grounded in negligence*.

Therefore, comparative fault has no application whatsoever."  (Docket No. 116 at 33 (emphasis

added).)  This seems to conflict with the Complaint, which alleges that the plaintiff was harmed

"as a result of these Defendants' negligence . . . in violation of the Tennessee common law."

(Docket No. 1 ¶ 15.)  The only explanation is that the plaintiff is abandoning her negligence

claim against CMCSS, so the court will dismiss that claim.

## <u>CONCLUSION</u>

For all of the above reasons, the court will strike the statements of Nikki Davis, Erica

Scott, and Mary Elizabeth Hart, as well as paragraphs 130-142 of the plaintiff's Statement of

Additional Undisputed Facts and paragraph 27 of the plaintiff's affidavit.  The court will dismiss

the plaintiff's § 1983 claim and her claims against CMCSS for intentional infliction of emotional

---

[12] The plaintiff cites *Fromuth v. Metropolitan Government of Nashville*, 158 F. Supp. 2d
787 (M.D. Tenn. 2001), but that case does not discuss immunity under the GTLA.  Also,
contrary to the plaintiff's assertion, this court did not previously rule on whether the GTLA bars
the plaintiff's outrageous conduct claim.  (*See* Docket No. 42, 51.)

distress, negligent infliction of emotional distress, outrageous conduct, and negligence. The plaintiff's Title IX claim against CMCSS remains for trial.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

Case 3:06-cv-00202   Document 146   Filed 11/09/09   Page 28 of 28 PageID #: 1386